# *Exhibit "A" to Complaint*

4817-9154-1774.3



# WATERS EDGE WINERY & BISTRO Franchise Agreement

Between

Waters Edge Wineries, Inc.
8560 Vineyard Avenue, Suite 408
Rancho Cucamonga, CA 91730
909-468-9463

And

_____Wine Vibes, LLC_____
Name of Franchisee

_____12405 Clover Creek Ln_____
Street

_____Pearland_____   Texas   _____77584_____
City   State   Zip Code

_____(832) 260-4171_____
Area Code   Telephone

Authorized Location:

_____To Be Determined_____
Street

City   State   Zip Code

Effective Date:
1/1/2021

(To be completed by Us)

--TABLE OF CONTENTS--

WATERS EDGE WINERY & BISTRO FRANCHISE AGREEMENT

| SECTION | PAGE |
|---|---|
| RECITALS | 1 |
| 1. DEFINITIONS | 1 |
| 2. GRANT OF LICENSE | 2 |
| 3. TRADEMARK STANDARDS AND REQUIREMENTS | 4 |
| 4. TERM AND RENEWAL | 5 |
| 5. FACILITY STANDARDS AND MAINTENANCE | 6 |
| 6. PRODUCTS AND OPERATIONS STANDARDS AND REQUIREMENTS | 8 |
| 7. PERSONNEL AND SUPERVISION STANDARDS | 13 |
| 8. ADVERTISING | 14 |
| 9. FEES, REPORTING AND AUDIT RIGHTS | 15 |
| 10. YOUR OTHER OBLIGATIONS; NONCOMPETE COVENANTS | 18 |
| 11. TRANSFER OF FRANCHISE | 20 |
| 12. DISPUTE RESOLUTION | 23 |
| 13. DEFAULT AND TERMINATION | 25 |
| 14. POST-TERM OBLIGATIONS | 26 |
| 15. GENERAL PROVISIONS | 28 |

ADDENDUMS

Personal Guarantee Addendum
Ownership and Management Addendum
Acknowledgment Addendum

APPENDICES

A. Trademarks
B. Designated Area
C. Addendum to Lease
D. Assignment of Telephone Numbers, Websites, Social Media Sites and Domain Names

WATERS EDGE WINERY & BISTRO® FRANCHISE AGREEMENT

This Franchise Agreement is made this 10th day of December, 2020 between Waters Edge Wineries, Inc., a California corporation, whose principal business address is 8560 Vineyard Avenue, Suite 408, Rancho Cucamonga, CA 91730 ("Franchisor," "our," "we" or "us"), and Wine Vibes, LLC, a Limited Liability Company, whose principal business address is 12405 Clover Creek Ln, Pearland Texas 77584 ("franchisee," "your" or "you"). If the franchisee is a corporation, partnership, limited liability company or other legal entity, certain provisions to this Agreement also apply to its owners.

## RECITALS

A.   We developed a unique system for operating retail locations that feature the manufacture and sale of wine, food and bistro menu items the teaching of winemaking and the sale of related wine accessories;

B.   We own the WATERS EDGE WINERY Trademarks and other trademarks used in connection with the operation of a WATERS EDGE WINERY store;

C.   We have the right to license the WATERS EDGE WINERY and WATERS EDGE WINERY AND BISTRO Trademarks and the right to develop and operate WATERS EDGE WINERY & BISTRO stores; and

D.   You desire to either (i) develop and operate a WATERS EDGE WINERY & BISTRO store using the WATERS EDGE WINERY trademarks; or (ii) if you are an existing franchisee operating a Private Branded Store, open additional stores under the same Private Brand as your first store and We, in reliance on your representations, have approved your franchise Application and Deposit Agreement.

E.   You asked and we agree to grant you: (CHECK ONE):

☒ A full franchise, granting you the right to use our trademarks, system and methodologies. A full franchise will entitle you to participate in our advertising program and receive advertising and marketing assistance in your territory;

☐ A private branded franchise, granting you the right to use our system and methodologies, but under a separate primary trademark you create and we approve. As a private branded franchise, you will not receive advertising and marketing assistance in your territory. This option is only available to existing Private Branded franchisees who want to open additional locations under the same brand as the first store.

In consideration of the foregoing and the mutual covenants and consideration below, you and we agree as follows:

## DEFINITIONS

1.   For purposes of this Agreement, the terms below have the following definitions:

A.   "Electronic Depository Transfer Account" means an account established at a national banking institution approved by us and providing us with access to electronically withdraw any funds due to us.

B.   "General Manager" means the individual who (i) personally invests his or her full time and attention and devotes his or her best efforts to the on-premises general management of the day-to-day operations of the Store, and (ii) does not participate in the active

operation or management of any business other than the Store. The General Manager must be appointed at least 60 days prior to the Store opening and fully trained 10 days prior to the Store opening. The General Manager is identified on the Ownership and Management Addendum attached to this Agreement.

C.  "Gross Sales" includes the total revenues and receipts from the sale of all products and services including, but not limited to, wine and wine products, food, winemaking courses, services, merchandise, and any wholesale items, sold onsite or offsite of your Store whether under any of the Trademarks or otherwise and includes, but is not limited to, winery rental fees received and any other revenues collected by you from your operations. Gross Sales does not include sales tax actually paid to government agencies and documented refunds provided to customers.

D.  "Principal Owner" means any person who directly or indirectly owns a 51% or greater interest in the franchisee when the franchisee is a corporation, limited liability company or a similar entity other than a partnership entity. If the franchisee is a partnership entity, then each general partner is a Principal Owner, regardless of the percentage ownership interest. If the franchisee is one or more individuals, each individual is a Principal Owner of the franchisee. Each franchisee must have at least one Principal Owner. Your Principal Owner(s) are identified on the Ownership and Management Addendum attached to this Agreement. As used in this Agreement, any reference to Principal Owner includes all Principal Owners.

E.  "Store" means the WATERS EDGE WINERY & BISTRO Store or private branded store you develop and operate pursuant to this Agreement. The Store you open will manufacture and store wine and prepare food items, and you will sell such wine and food items in a retail location that meets our building plans and décor specifications as set forth in subparagraph 5.B.

F.  "System" means the WATERS EDGE WINERY & BISTRO System, which consists of distinctive manufacturing of wine products prepared according to special recipes and formulas with unique manufacturing and storage procedures and techniques, and food items, all offered in a setting of a distinctive exterior and interior facility, layout, signage and materials and using certain distinctive types of equipment such as our Custom Winery Systems, supplies, ingredients, business techniques, methods and procedures together with sales promotion programs, all of which we may modify and change from time to time.

G.  "Trademarks" means the WATERS EDGE WINERY and WATERS EDGE WINERY & BISTRO Trademarks and Service Marks that are registered in the United States Trademark Office, and the trademarks, service marks and trade names set forth on Appendix A, as we may modify and change from time to time, and the trade dress and other commercial symbols used in the Store. Trade dress includes the designs, color schemes and image we authorize you to use in the operation of the Store from time to time.

## GRANT OF LICENSE

2.  The following provisions control with respect to the license granted hereunder:

A.  <u>Authorized Location</u>. We grant to you the right and license to establish and operate a Store identified by the WATERS EDGE WINERY & BISTRO Trademarks or such other marks as we may direct. The Store will be located at <u>To Be Determined</u> or a location to be designated within 90 days from the date of this Agreement (the "Authorized Location"). When a location has been designated and consented to by you and us, it will become part of this subparagraph 2.A as if originally stated. Unless you seek and we grant you an extension in

writing, if an Authorized Location is not designated within 90 days from the date of this Agreement (the "Location Deadline"), we have the right to declare this Agreement null and void without the return of any Initial Franchise Fee or other amounts paid to us. We will not unreasonably withhold consent to one 90 day extension of the Location Deadline, if prior to the expiration of the Location Deadline you seek our approval in writing to the extension together with an explanation of steps taken to date and your future plan to identify a location. Otherwise, we have no obligation to grant an extension or provide another extension, if one has already been given. You accept the license and undertake the obligation to operate the Store at the Authorized Location using the Trademarks and the System in compliance with the terms and conditions of this Agreement.

        B.      Designated Area. You must locate and operate the Store at an Authorized Location within the area described in Appendix B (the "Designated Area"). You may sell WATERS EDGE WINERY & BISTRO products and services only at or from the Store as set forth in the Operations Manuals.

We will not locate and operate or grant to anyone else a franchise or license to locate and operate a WATERS EDGE WINERY & BISTRO store within the Designated Area so long as this Agreement is in effect, except for the Special Sites defined in subparagraph 2.D. You do not have any right to sublicense or subfranchise within or outside of the Designated Area and do not have the right to operate more than one Store within the Designated Area. If your Store is located within a Special Site (as defined below), you receive no territorial rights. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

        C.      Opening. You agree that the Store will be open and operating in accordance with the requirements of subparagraph 5.A within 12 months after the date the Authorized Location is designated and no more than 60 days after you complete training, unless we authorize in writing an extension of time.

        D.      Our Reservation of Rights. The license is limited to the right to develop and operate one Store at the Authorized Location located in the Designated Area. This license does not include (i) any right to sell products and services identified by the Trademarks at (1) any location other than the Store authorized under this Agreement; or (2) through any unapproved channel or method of distribution, including through a website owned and operated by any entity other than us, unless approved by us in writing; or (ii) any right to exclude, control or impose conditions on our development of future franchised, company or affiliate owned stores at any time or at any location outside of the Designated Area.

You acknowledge and agree that we have the right (i) anywhere outside of the Designated Area to grant other franchises and licenses and to develop and operate company or affiliate owned WATERS EDGE WINERY & BISTRO stores; (ii) to offer, sell and distribute inside and outside of the Designated Area any products or services associated with the System (now or in the future) under the Trademarks or any other trademarks, service marks or trade names through any distribution channel or method, all without compensation to you (except that any internet sales may be at our sole discretion either (a) directed to the store located in the Designated Area nearest to where the customer is located for fulfillment; or (b) if we elect to fulfill the online order to a customer in your Designated Area, we will pay fifty (50%) of the internet product's sale price less taxes, shipping and handling to you); and (iii) to operate and franchise or license others to operate stores offering similar products and services as you do or any other business within and outside the Designated Area under trademarks other than the WATERS EDGE WINERY & BISTRO Trademarks, without compensation to you, except that

our operation of, or association or affiliation with, stores (through franchising or otherwise) in the Designated Area that compete with WATERS EDGE WINERY & BISTRO stores in the wine and beverage segment will only occur through some form of merger or acquisition with an existing store chain.

Further, you acknowledge that certain locations within the Designated Area are by their nature unique and separate in character from sites generally developed as or serviced by WATERS EDGE WINERY & BISTRO stores. As a result, you agree that the following locations ("Special Sites") are excluded from your Designated Area and we have the right under our Trademarks or otherwise, to operate in, franchise, license and provide raw materials, ingredients, training and equipment or products to: (1) casinos; (2) military bases; (3) race tracks; (4) theme parks, including water parks and amusement parks; (5) hotels; (6) restaurants; (7) malls; (8) airports and (9) selected specialty retail venues, such as fairgrounds or other tourist oriented destinations (all of which may exist now or in the future).

## TRADEMARK STANDARDS AND REQUIREMENTS

3. You acknowledge and agree that the Trademarks are our property. You further acknowledge that your right to use the Trademarks is specifically conditioned upon the following:

   A. <u>Trademark Ownership</u>. We grant you the right to use the Trademarks in operating your Store. The Trademarks are our valuable property, and we are the owner of all right, title and interest in and to the Trademarks and all past, present or future goodwill of the Store and of the business conducted at the Authorized Location that is associated with or attributable to the Trademarks. Your use of the Trademarks will inure to our benefit. You may not, during or after the term of this Agreement, engage in any conduct directly or indirectly that would infringe upon, harm or contest our rights in any of the Trademarks or the goodwill associated with the Trademarks, including any use of the Trademarks in a derogatory, negative, or other inappropriate manner in any media, including but not limited to print or electronic media.

   B. <u>Trademark Use</u>. You may not use, or permit the use of, any trademarks, trade names or service marks in connection with the Store except those set forth in Appendix A or except as we otherwise direct in writing. You may use the Trademarks only in connection with such products and services as we specify and only in the form and manner we prescribe in writing. You must comply with all trademark, trade name and service mark notice marking requirements. Each wine bottle must contain a label with the approved WATERS EDGE WINERY logo. You may use the Trademarks only in association with products and services approved by us and that meet our standards or requirements with respect to quality, method and condition of manufacturing, storage, production, preparation and sale, and portion and packaging.

If pursuant to Recital E above, you are granted a private branded franchise, you must, after obtaining our written consent to the proposed name or mark, use and/or adopt another primary trademark and/or trade name in connection with your franchise (in addition to the Trademarks). You agree to include such other designations that we may request in connection with your primary trademark and trade name, which may include, for example a designation indicating you are an affiliate of Waters Edge Wineries, operating under license. You acknowledge and agree that any mark or name that you adopt in connection with the operation of your franchise will belong to and inure to our benefit. You agree to assign all such marks and names and any registrations for such marks and names to us on written request and to take all further and other steps requested by us to effectuate the assignment of these marks and names to us. On termination or expiration

of your franchise, you must stop using the Trademarks and all other marks and names adopted in connection with your franchise.

    C. <u>Store Identification and Other Uses of Marks</u>. Except as directed by us, you must use the name WATERS EDGE WINERY & BISTRO as the trade name of the Store and you may not use any other mark or words to identify the Store without our prior written consent. You may not use the words WATERS EDGE WINERY or any of the other Trademarks as part of the name of your corporation, partnership, limited liability company or other similar entity. You may use the Trademarks on various materials, such as business cards, stationery and checks, provided you (i) accurately depict the Trademarks on the materials, (ii) include a statement on the materials indicating that the business is independently owned and operated by you, (iii) do not use the Trademarks in connection with any other trademarks, trade names or service marks unless we specifically approve in writing prior to such use, (iv) seek and obtain our prior written approval for use of the Trademarks on the proposed materials prior to use, and (v) make available to us, upon our request, a copy of any materials depicting the Trademarks. You must post a prominent sign in the Store identifying yourself as a WATERS EDGE WINERY franchisee in a format we deem reasonably acceptable, including an acknowledgment that you independently own and operate the Store and that the WATERS EDGE WINERY Trademark is owned by us and your use is under a license we have issued to you. If you are a private branded franchise, your adopted store name must always display the words "An Affiliate of Waters Edge Wineries" in the vicinity of your approved logo. The Affiliate designation must not be less than 30% the size of your approved logo.

    D. <u>Litigation</u>. In the event any person or entity improperly uses or infringes the Trademarks or challenges your use or our use or ownership of the Trademarks or our other intellectual property, such as copyrights or patents, we will control all litigation and we have the right to determine whether suit will be instituted, prosecuted or settled, the terms of settlement and whether any other action will be taken. You must promptly notify us of any such use or infringement of which you are aware or any challenge or claim arising out of your use of any Trademark. You must take reasonable steps, without compensation, to assist us with any action we undertake. We will be responsible for our fees and expenses with any such action, unless the challenge or claim results from your misuse of the Trademarks in violation of this Agreement, in which case you must reimburse us for our fees and expenses.

    E. <u>Changes</u>. You may not make any changes or substitutions to the Trademarks unless we direct in writing. We reserve the right to change the Trademarks at any time. Upon receipt of our notice to change the Trademarks, you must cease using the former Trademarks and commence using the changed Trademarks at your expense.

TERM AND RENEWAL

4. The following provisions control with respect to the term and renewal of this Agreement:

    A. <u>Term</u>. The initial term of this Agreement is 10 years unless this Agreement is sooner terminated in accordance with Paragraph 13. The initial term commences upon the Effective Date of this Agreement. We may extend this initial term in writing for a limited period of time not to exceed 6 months to take into account the term of any applicable lease for the Authorized Location.

    B. <u>Renewal Term and Conditions of Renewal</u>. You may renew this Agreement for an additional term of 10 years, provided that: (i) you have given us written notice of your decision to renew at least 6 months but not more than 12 months prior to the end of the expiring

term; (ii) you sign our then-current form of franchise agreement, the terms of which may differ from this Agreement, including higher fees and modified to reflect no additional renewal term upon expiration and other modifications to reflect that the agreement relates to the grant of a renewal; (iii) you have complied with the provisions of subparagraph 5.E regarding modernization; (iv) you are not in default of this Agreement or any other agreement pertaining to the franchise granted at the time you provide notice of your intent to renew or at the time of renewal, have satisfied all monetary and material obligations on a timely basis during the term and are in good standing; (v) if leasing the Store premises (and not subject to relocation under (iii) above), you have renewed the lease and have provided written proof of your ability to remain in possession of the premises throughout the renewal period; (vi) you comply with our then-current training requirements; (vii) you and your Principal Owners and guarantors execute a general release of claims in a form we prescribe; and (viii) you pay us or our designee a renewal fee in the amount of $5,000.

      C.    <u>Month-to-Month Agreement</u>. If you do not sign our then-current Franchise Agreement prior to the expiration date and you continue to accept the benefits of this Agreement after it expires, then at our option, this Agreement may be treated either as (i) expired as of the expiration date with you then operating without a license and in violation of our rights; or (ii) continued on a month-to-month basis ("Month-to-Month Agreement") until one party provides the other with written notice of such party's intent to terminate the Month-to-Month Agreement, in which case the Month-to-Month Agreement will terminate thirty (30) days after receipt of the notice to terminate the Month-to-Month Agreement, or such longer notice period as is required by applicable law. In the latter case, all of your obligations shall remain in full force and effect during the Month-to-Month Agreement as if this Agreement had not expired, and all obligations and restrictions imposed on you on expiration of this Agreement will be deemed to take effect upon termination of the Month-to-Month Agreement.

FACILITY STANDARDS AND MAINTENANCE

5.    You acknowledge and agree that we have the right to establish, from time to time, quality standards regarding the business operations of W<small>ATERS</small> E<small>DGE</small> W<small>INERY</small> & B<small>ISTRO</small> stores to protect the distinction, goodwill and uniformity symbolized by the Trademarks and the System. Accordingly, you agree to maintain and comply with our quality standards and agree to the following terms and conditions:

      A.    <u>Store Facility; Lease</u>. You are responsible for purchasing or leasing a site that meets our site selection considerations. We must consent to the site in writing.

You may not open your Store for business until we have notified you in writing that you have satisfied your pre-opening obligations as set forth in subparagraphs 5.A and 5.B and we have approved your opening date. We are not responsible or liable for any of your pre-opening obligations, losses or expenses you might incur for your failure to comply with these obligations or your failure to open by a particular date. We also are entitled to injunctive relief or specific performance under subparagraph 12.D for your failure to comply with your obligations.

In the event that you enter into any type of lease for the Store premises, you must provide the lease to us and receive our prior written approval of the lease before you execute it. We have no responsibility for the lease; it is your sole responsibility to evaluate, negotiate and enter into the lease for the Store premises. Your lease must contain the Addendum to Lease attached as Appendix C. You must provide us a copy of the lease and Addendum within 5 days of their execution.

B.  <u>Construction</u>.  You may not commence construction of the Store until you have received our written consent to your building plans and your design and décor layout.  You also must construct and equip the Store in accordance with our current approved specifications and standards pertaining to equipment, inventory, signage, fixtures and design and layout of the building.  You must use our designated construction management firm.

Without limiting the generality of the prior paragraph, you must promptly after obtaining possession of the site for the Store:  (i) have prepared and submitted for our approval basic architectural plans and specifications (not for construction) consistent with our general atmosphere, image, décor, color scheme and ambience requirements as set forth from time to time in the Operations Manuals for a WATERS EDGE WINERY & BISTRO store (including requirements for dimensions, exterior design, materials, interior design and layout, equipment, signs and decorating); (ii) purchase or lease and then, in the construction of the Store, use only the approved equipment, fixtures and signs; (iii) complete the construction and/or remodeling, equipment, fixtures, furniture and sign installation and decorating of the Store in full compliance with plans and specifications we approve and all applicable ordinances, building codes and permit requirements without any unauthorized alterations; (iv) obtain all customary contractors' sworn statements and partial and final waivers; (v) obtain all necessary permits, licenses and architectural seals and comply with applicable legal requirements relating to the building, signs, equipment and premises, including, but not limited to, the Americans With Disabilities Act; and (vi) obtain and maintain all required zoning changes, building, utility, health, sanitation, winery and sign permits and licenses and any other required permits and licenses.  It is your responsibility to comply with the foregoing conditions.

Any change to the interior or exterior decor or image, equipment or signage of the Store to be made after our consent is granted for initial plans, whether at the request of you or of us, must be made in accordance with specifications that have received our prior written consent.  You may not commence such addition or modification until you have received our written consent to your revised plans.

C.  <u>Maintenance</u>.  The building, equipment, fixtures, signage and trade dress (including the interior and exterior appearance) employed in the operation of your Store must be maintained and refreshed in accordance with our requirements established periodically and any of our reasonable schedules prepared based upon periodic evaluations of the premises by our representatives.  Within a period of 30-60 days (as we determine depending on the work needed) after the receipt of any particular report prepared following such an evaluation, you must affect the items of maintenance we designate, including the repair of defective items and/or the replacement of irreparable or obsolete items of equipment and signage.  If, however, any condition presents a threat to customers or public health or safety, you must affect the items of maintenance immediately.

D.  <u>Relocation</u>.  If you need to relocate because of condemnation, destruction, or expiration or cancellation of your lease for reasons other than your breach, we will grant you authority to do so at a site acceptable to us that is within your Designated Area; provided that you locate a site acceptable to us and are open and operating within 60 days from closing the Store, all in accordance with our then-current standards.  If you voluntarily decide to relocate the Store, your right to relocate the Store will be void and your interest in this Agreement will be voluntarily abandoned, unless you have given us notice of your intent to relocate not less than 30 days prior to closing the Store, have procured a site that we accept within 15 days after closing the prior Store, have opened the new Store for business within 60 days of such closure and complied with any other conditions that we reasonably require.

You must pay the costs of any relocation, and we reserve the right to charge you for any reasonable costs that we incur.

You do not have the right to relocate in the event you lose the right to occupy the Store premises because of the cancellation of your lease due to your breach, rather the cancellation of your lease due to your breach is grounds for immediate termination under subparagraph 13.B.2.

E.   Modernization or Replacement. From time to time as we require, you must affect items of modernization and/or replacement of the trade dress or equipment as may be necessary for your Store to conform to the standards for similarly situated new WATERS EDGE WINERY & BISTRO stores. You must complete to our satisfaction any changes we require within 3 months from the date you are notified of any required changes. We will not require you to spend more than $50,000 annually on any required modernization and/or replacement of trade dress or equipment pursuant to this section. However, the monetary limits described above will not apply to any modernization and/or replacement of trade dress we may require in connection with a transfer or renewal of the Franchise.

Notwithstanding the prior paragraph, we will not require you to make any modernization expenditures during the first 5 years of this Agreement (except in the event of a transfer as noted below). You, however, must perform general, continued maintenance and refreshing of the Store premises whenever necessary as set forth in subparagraph 5.C. Further, each and every transfer of any interest in this Agreement or your Store or business governed by Paragraph 11 or renewal covered by Paragraph 4 is expressly conditioned upon your compliance with these requirements at the time of transfer or renewal.

You acknowledge and agree that the requirements of this subparagraph 5.E are both reasonable and necessary to insure continued public acceptance and patronage of WATERS EDGE WINERY & BISTRO stores. If you fail to make any improvement or perform the maintenance listed above, we may, in addition to our other rights in this Agreement, effect such improvement or maintenance and you must reimburse us for the costs we incur.

F.   Signage. In addition to installing interior signage that accurately displays the Trademarks, you also must purchase an approved outdoor sign at your expense which must bear the WATERS EDGE WINERY & BISTRO logo or other mark we designate and complies with our specifications, which we may modify and change from time to time due to modifications to the System, including changes to the Trademarks. If you are a private braded franchise, your signage must say "An affiliate of" with the WATERS EDGE WINERY & BISTRO logo. You must make such changes to the outdoor signage as we require. Your failure to replace the signage within 3 months from the date of notification will constitute a default of this Agreement under Paragraph 13. Any upgrades to the type or size of your outdoor signage will be at your expense.

## PRODUCTS AND OPERATIONS STANDARDS AND REQUIREMENTS

6.   You must implement and abide by our requirements and recommendations directed to enhancing substantial System uniformity. The following provisions control with respect to products and operations:

A.   Authorized Products and Ingredients. You must use in the operation of the Store and in the preparation and manufacture of wine and other beverage products only the proprietary and non-proprietary ingredients, recipes, formulas, techniques, processes and supplies, and must prepare and sell wine and products in such appearance and packaging, all as we specify in our most current operations material or otherwise in writing. You acknowledge and agree that we may change these materials periodically and that you are obligated to conform to the

requirements. All supplies, including containers and other customer service materials of all descriptions and types must meet our standards of uniformity and quality. You acknowledge that the Store must at all times maintain an inventory of ingredients and beverage products and other products, material and supplies that will permit operation of the Store at maximum capacity. You must carry and offer for sale all approved products and services we designate. You must not carry or offer for sale any unapproved product or service.

      B.     Approved Supplies and Suppliers. We will furnish to you from time to time lists of approved supplies or approved suppliers. You must only use approved products, inventory (including ingredients), equipment, fixtures, signs, advertising materials, trademarked items and novelties, and other items (collectively, "approved supplies") in the Store as set forth in the approved supplies and approved suppliers lists, as we may amend from time to time. Although we do not do so for every item, we have the right to approve the manufacturer of approved supplies. You acknowledge and agree that certain approved supplies may only be available from one source, and we may be that source. For instance, we are currently the only approved supplier for the custom winery system, juice and other supplies. We will derive revenue from the sale of products and supplies to you. All inventory, products, materials and other items and supplies used in the operation of the Store that are not included in the approved supplies or approved suppliers lists must conform to the specifications and standards we establish from time to time. ALTHOUGH APPROVED BY US, WE MAKE NO WARRANTY AND EXPRESSLY DISCLAIM ALL WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO PRODUCTS, EQUIPMENT (INCLUDING WITHOUT LIMITATION AND ANY REQUIRED COMPUTER SYSTEMS), SUPPLIES, FIXTURES, FURNISHINGS OR OTHER APPROVED ITEMS.

      C.     Computer System and POS. You must purchase and use the computer system that we developed for the Store, including all future updates, maintenance, supplements and modifications (the "Computer System"). The Computer System includes hardware and software used in the operation of the Store. We reserve the right to require you to purchase or lease software that provides a system used to track and manage unfinished goods inventory, purchase orders and tax information. The computer hardware component of the Computer System must conform to specifications we develop. You must also purchase or lease and install a POS System and software meeting our requirements and pay for annual support for the POS System. We can require you to pay us direct for the software licensing fees to allow us to take advantage of better pricing on a systemwide basis. We have the right to require you to upgrade, update and change the computer hardware and software systems and POS hardware and software systems on written notice, at your expense. You must comply with all directives we issue in this regard. You acknowledge and agree that we will have full and complete access to information and data entered and produced by the Computer System and POS. You must have at the Authorized Location internet access with a form of high speed connection as we require and you must maintain an email account for our direct correspondence with you and the Store. Each party to this Agreement acknowledges and agrees that changes to technology are dynamic and not predictable within the term of this Agreement. In order to provide for inevitable but unpredictable changes to technological needs and opportunities, you agree that we will have the right to establish, in writing, reasonable new standards for the implementation of technology in the System; and you agree to comply with those reasonable new standards that we establish.

      D.     Intranet. We will operate an Intranet system that we authorize you to access. You will have the mere privilege to use the Intranet, subject to your strict compliance with the standards and specifications, protocols and restrictions that we may establish from time to time in the Manuals and otherwise. You acknowledge that, as administrator of the Intranet, we

may access and view any communication posted on the Intranet. You further acknowledge that the Intranet facility and all communications that are posted to it will become our property, free of any claims of privacy or privilege that you or any other person may assert. You must establish and continually maintain an electronic connection with the Intranet as specified in the Operations Manuals that allows us to send messages to and receive messages from you. If you default under this Agreement or any other agreement with us, we may, in addition to, and without limiting any other rights and remedies available to us, disable or terminate your access to the Intranet without us having any liability to you.

E.  Evaluations. We or our authorized representative have the right to enter your Store at all reasonable times during the business day for the purpose of making periodic evaluations and to ascertain if the provisions of this Agreement are being observed by you, to inspect and evaluate your premises, equipment, and to test, sample, inspect and evaluate your supplies, ingredients and products, as well as the storage, preparation and formulation and the conditions of sanitation and cleanliness in the storage, production, manufacture, handling and serving. Any evaluation that you fail is a default under this Agreement. Further, if we determine that any condition in the Store presents a threat to customers or public health or safety, we may take whatever measures we deem necessary, including requiring you to immediately close the Store until the situation is remedied to our satisfaction.

F.  Period of Operation. Subject to any contrary requirements of local law, your Store must be opened to the public and operated at least 8 hours each day, at least 6 days a week. Any variance from this provision must be authorized by us in writing. You are permitted to close the Store one day a week, but this day must be consistent from week to week. For instance, you may not be closed on a Monday one week and on a Sunday the next, without first obtaining our written consent and notifying your customers of the change. You acknowledge and agree that if your Store is closed for a period of 3 consecutive days or 10 or more days (not including the one day a week in which you are permitted to close) in any 12-month period without our prior written consent, such closure constitutes your voluntary abandonment of the franchise and business and we have the right, in addition to other remedies provided for herein, to terminate this Agreement. Acts of God, war, strikes, riots or other force majeure cause preventing you temporarily from complying with the foregoing will suspend compliance for the duration of such interference.

G.  Operating Procedures. You must adopt and use as your continuing operational routine the required standards, procedures, techniques and management systems described in the Operations Manuals or other written materials relating to product manufacture, preparation and storage, financial management, equipment and facility. We will revise the Confidential Operations Manual and Food Operations Manual ("Operations Manuals") and these standards, procedures, techniques and management systems periodically to meet changing conditions of retail operation in the best interest of stores operating under the Trademarks. Any required standards exist to protect our interests in the System and the Trademarks and not for the purpose of establishing any control or duty to take control over those matters that are reserved to you.

You acknowledge having received one copy of or access to the Operations Manuals for use during the term of this Agreement. The Operations Manuals at all times are our sole property. You must at all times treat the Operations Manuals, and the information they contain, as secret and confidential, and must use all reasonable efforts to maintain such information as secret and confidential. We may from time to time revise the contents of the Operations Manuals and other materials and you expressly agree to comply with each new or changed requirement. You must at all times insure that your copy of the Operations Manuals are kept current and up to date, and in the event of any dispute as to the contents of the Operations Manuals, the terms of the master copy of the Operations Manuals that we maintain is controlling. You acknowledge

and agree that in the future the Operations Manuals and other system communications may only be available on the internet or other online or computer communications.

You acknowledge that your compliance with the Operations Manuals is vitally important to us and other System franchisees and is necessary to protect our reputation and the goodwill of the Trademarks and to maintain the uniform quality of operation through the System. However, while the Operations Manuals are designed to protect our reputation and the goodwill of the Trademarks, they are not designed to control the day-to-day operation of the Store.

H.  Confidential Information. You, the Principal Owners, and the General Manager may not, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person or entity any Confidential Information, except to such employees as must have access to it in order to operate the Store. For purposes of this Agreement, "Confidential Information" means all proprietary information, the software used in operating your Store, the Operations Manuals and other information communicated to you in writing, verbally or through the internet or other online or computer communications, and any other knowledge or know-how concerning the methods of operation of the Store. Any and all Confidential Information, including, without limitation, the Operations Manuals, proprietary ingredients, secret formulas and recipes, methods, procedures, suggested pricing, specifications, processes, materials, techniques and other data, may not be used for any purpose other than operating the Store. In addition, during the term of this Agreement or thereafter, you may not teach classes for or at any school, public, private or otherwise, that conveys any information about our proprietary winemaking processes or franchise operations. We may require that you obtain nondisclosure and confidentiality agreements in a form satisfactory to us from any persons owning a minority interest in the franchisee, the Principal Owners, the General Manager and other key employees. You must provide executed copies of these agreements to us upon our request.

I.  Compliance with Law; Licenses and Permits. You must at all times maintain your premises and conduct your Store operations in compliance with all applicable laws, regulations, codes and ordinances. You must secure and maintain in force all federal, state and local licenses and permits relating to the operation of your Store. This includes, but is not limited to, a federal winery license, a state winery license and all retail alcohol, food and business licenses required. It is your sole responsibility to comply with all applicable local, state and federal laws and requirements regarding the advertising, sale and labeling of alcoholic beverages and food items. Your failure to secure and maintain all necessary federal, state and local licenses required for the operation of your Store and/or to comply with all requirements for advertising, selling and labeling of alcoholic beverages and food items is a breach of this Agreement and grounds for termination pursuant to Paragraph 13.

You acknowledge that you are an independent business and responsible for control and management of your Store, including, but not limited to, the hiring and discharging of your employees, and setting and paying wages and benefits of your employees. You agree to comply with all applicable laws pertaining to the privacy of customers, employees, and financial transactional information ("Privacy Laws"). You acknowledge that we have no power, responsibility or liability in respect to the hiring, discharging, setting and paying of wages or related matters for your personnel.

You must immediately notify us in writing of any claim, litigation or proceeding that arises from or affects the operation or financial condition of your WATERS EDGE WINERY & BISTRO business or Store, including any notices of health code violations or winery license violations.

J.     **Participation in Internet Web Sites or Other Online Communications**. We reserve the right to require you to, at your expense, participate in the WATERS EDGE WINERY web site, any intranet or extranet system we may develop or other online communications as we may require. You must pay our then current rates to access these systems. We have the right to determine the content and use of the web site and any intranet or extranet system we may develop and will establish the rules under which franchisees may or must participate. We reserve the right to sell wine and wine related products on the website, and agree to split the proceeds of the sale in the manner described in Section 2(D). We retain all rights relating to the web site and any intranet or extranet system we may develop and may alter or terminate the web site, intranet or extranet system. Your general conduct on the web site, intranet and extranet system or other online communications and specifically your use of the Trademarks or any advertising is subject to the provisions of this Agreement. You acknowledge that certain information related to your participation in the web site, intranet or extranet system may be considered Confidential Information, including access codes and identification codes. Your right to participate in the web site, intranet and extranet system, or otherwise use the Trademarks or System on the internet or other online communications, will terminate when this Agreement expires or terminates.

K.     **Websites, Social Media and Domain Names**. You may not separately register any domain name containing any of the Trademarks or operate your own website selling wine or related products or any social media site or page for your Store, whether or not they contain our Trademarks without our express prior written consent. If we consent to your registration and/or use of a domain name, website or social media site or page for your business (whether acquired, registered and/or used before or after entering into this Agreement), you must place such domain name(s), website(s) and social media site(s) or page(s) in our name and/or transfer the ownership of the domain name(s), website(s) and social media site(s) or page(s) to us, and take whatever other action we may require in this regard. On termination or expiration of this Agreement, you agree that we may keep and if not already done so, you must transfer to us any domain names, social media site(s) or pages(s) and websites used in operation of your Store.

L.     **System Modifications**. You acknowledge and agree that we have the right to modify, add to or rescind any requirement, standard or specification that we prescribe under this Agreement to adapt the System to changing conditions competitive circumstances, business strategies, business practices and technological innovations and other changes as we deem appropriate. You must comply with these modifications, additions or rescissions at your expense, subject to any express limitations set forth in this Agreement.

M.     **Suggested Pricing Policies**. We may, from time to time, make suggestions to you with regard to your pricing policies. We retain the right to establish maximum and minimum prices to be charged by you for sales, promotions or otherwise, but any exercise of that right will be specifically set forth in writing. You must honor the terms of all promotional or discount programs that we offer and comply with any pricing policies we may specify, including minimum and maximum price policies, minimum advertised price policies and unilateral price policies (when permitted by law).

N.     **Vending Services**. You may not install or maintain on the premises of the Store any newspaper racks, video games, jukeboxes, gaming machines, gum machines, games, rides, vending machines, pool tables, automated teller machines or other similar devices without our prior written approval.

  O. <u>Uniforms</u>. You must purchase and your employees must at all times wear uniforms while on duty imprinted with the Trademarks and conforming to other specifications prescribed by us.

  P. <u>Converting from our Private Branded Franchise Program to the Full Franchise Program</u>. If you are a private branded franchisee in good standing and: (1) you are in full compliance with the terms of this Agreement; and (2) you want to convert to our Full franchise program, we may, at our sole discretion, elect to provide you an allowance to assist with the costs involved to change signage and re-brand to the Full franchise program. Nothing herein shall impose an obligation on us to do so. You will be subject to the advertising fee and all other requirements of the full franchise program after the conversion.

  Q. <u>Toll-Free Telephone Number</u>. We have the right, but not the obligation, to establish and maintain a toll free telephone number for the purpose of accepting and confirming customer orders nationwide, customer service, and customer follow-up and satisfaction surveys. If we establish a toll free number, you must comply with our procedures for implementing the nationwide service as we specify in the Operations Manuals or otherwise in writing.

<u>PERSONNEL AND SUPERVISION STANDARDS</u>

7. The following provisions and conditions control with respect to personnel, training and supervision:

  A. <u>Supervision</u>. You must have a General Manager at all times during the term of this Agreement. You and your General Manager must ensure that the Store is operated in accordance with the terms and conditions of this Agreement.

  B. <u>Training</u>. You must, at your expense, comply with all of the training requirements we prescribe for the Store to be developed under this Agreement. You and your General Manager must attend remote training provided via the web as well as classroom training in Rancho Cucamonga, California (or any other location designed by us in the future) and complete training to our satisfaction. The initial training also includes custom winery system training, the duration of which will depend on whether you are purchasing a large tank system or a small tank system, and other pre-opening assistance that we or our designee provide at your Store prior to opening. In the event you are given notice of default as set forth in subparagraphs 13.A and B and the default relates, in whole or in part, to your failure to meet any operational standards, we have the right to require as a condition of curing the default that you, and the General Manager, at your expense, comply with the additional training requirements we prescribe. Any new General Manager must comply with our training requirements within a reasonable time as we specify. You must pay all costs and our then current fees and travel expenses (if any) for such training. Under no circumstances may you permit management of the Store's operations on a regular basis by a person who has not successfully completed to our reasonable satisfaction all applicable training we require. We have no obligation to provide initial training if (i) you or an affiliate (if you are an entity) already owns or operates a Waters Edge Winery Store as of the date of this agreement; or (ii) this Agreement is executed as a renewal franchise agreement.

  C. <u>Ongoing Training</u>. We may require you and your General Manager to attend, at your expense, ongoing training at our training facility, the Authorized Location or any other location we designate. You must pay all costs and our then current fees for such training, including any travel expenses we incur to provide the training if at the Authorized Location.

  D. <u>Additional Assistance</u>. If you ask and we agree to provide additional assistance to you, you must pay our then current fees for such assistance plus our personnel's travel expenses.

E.   Staffing. You will determine who to retain, how many people to retain (subject to any minimum staffing requirements we may prescribe), how you compensate your personnel, terms of employment and working conditions, when and how to discipline the personnel you hire, and when and how to terminate the personnel you hire. You are required at all times to comply with all applicable employment laws. No employee of yours will be deemed to be an agent or employee of ours for any purpose whatsoever and we are not a joint employer of those persons.

F.   Attendance at Meetings. You must attend, at your expense, our annual franchise convention. You must also attend, at your expense, any regional meetings that we hold relating to new products or product preparation procedures, new operational procedures or programs, training, store management, sales or sales promotion, or similar topics. If you are not able to attend a meeting or convention, you must notify us at least 30 days prior to the meeting. You must pay our then current fee for attending our annual franchise conventions and regional meetings. You are also responsible for travel, lodging and related costs and fees for all persons who attend from your Store.

G.   Payroll Service. You must retain an outside payroll service to provide payroll services to your employees.

## ADVERTISING

8.   You agree to actively promote your Store, to abide by all of our advertising requirements and to comply with the following provisions:

A.   Required Local Expenditures, Approved Materials. You must use your best efforts to promote and advertise the Store and participate in any local advertising and promotional programs we establish from time to time. You are required to spend 5% of your Gross Sales on approved local advertising and promotion. On a quarterly basis you must provide us with itemization and proof of advertising and an accounting of the monies that you have spent for approved local advertising. If you fail to make the required expenditure, we have the right to collect and contribute the deficiency to the Advertising Fund (defined below). You must use only such marketing and advertising materials as we furnish, approve or make available, and the materials must be used only in a manner that we prescribe. You must submit your proposed advertising or marketing materials to us prior to their use. We will approve or reject the materials within 10 days of receipt. Furthermore, any promotional activities you conduct in the Store or on its premises are subject to our approval. We will not unreasonably withhold approval of any sales promotion materials and activities; provided that they are current, in good condition, in good taste, accurately depict the Trademarks and used in a manner that we have prescribed. For each advertisement or promotion you publish or conduct, it is your sole responsibility to comply with local, state and federal laws regarding the sale of liquor or the operation of a winery.

B.   Advertising Fund. We reserve the right to establish and operate an Advertising Fund on 60 days' written notice to you and require you to pay an Advertising Fee as set forth in subparagraph 9.C. All Advertising Fees will be placed in an Advertising Fund that we own and manage. The Advertising Fund is not a trust or escrow account, and we have no fiduciary obligation to franchisees with respect to the Advertising Fund. We have the right to determine the expenditures of the amounts collected and the methods of marketing, advertising, media employed and contents, terms and conditions of marketing and advertising campaigns and promotional programs. Because of the methods used, we are not required to spend a prorated amount on each store or in each advertising market. We have the right to make disbursements from the Advertising Fund for expenses incurred in connection with the cost of formulating, developing and implementing marketing, advertising and promotional campaigns. The disbursements may

include payments to us for the expense of administering the Advertising Fund, including accounting expenses and salaries and benefits paid to our employees engaged in the advertising functions. If requested, we will provide you an annual unaudited statement of the financial condition of the Advertising Fund. If you have a private branded franchise, this Section 8.B shall not apply to you.

        C.    <u>Grand Opening Promotion</u>. You must conduct certain advertising and public relations activities in connection with the opening of your Store, as we specify in writing. We require you to spend at least $5,000 on approved grand opening materials and activities.

FEES, REPORTING AND AUDIT RIGHTS

9.    You must pay the fees described below and comply with the following provisions:

    A.    <u>Initial Franchise Fee</u>.

        (i)    You must pay to us or our designee a nonrefundable Initial Franchise Fee of $50,000, Ten Thousand ($10,000) of which you will pay when you sign the Franchise Application and Deposit Agreement. The remaining $40,000 of the Initial Franchise Fee is due and payable in full on the date you sign this Agreement, is earned on receipt and is in consideration for our expenses incurred and services rendered in granting you franchise rights. We waive the Initial Franchise Fee if you are a private branded franchisee converting to our Full Franchise program.

        (ii)    <u>Initial Franchise Fee - Additional Locations</u>. Should we approve your application to purchase an additional Waters Edge franchise, the parties shall, for each additional franchise so purchased, enter into our then current form of Franchise Agreement, except that the amount of the initial franchise fee shall be as follows:

        1.    For the second Waters Edge franchise purchased by you or your affiliate (i.e. another entity you or your owners control), the Initial Franchise Fee shall be our then current initial franchise fee charged to franchisees (without any reduction);

        2.    For the third Waters Edge franchise purchased by you or your affiliate (i.e. another entity you or your owners control), the Initial Franchise Fee shall be fifty percent (50%) of our then current Initial Franchise Fee charged to franchisees;

        3.    For the fourth Waters Edge franchise purchased by you or your affiliate (i.e. another entity you or your owners control) and each subsequent franchise thereafter, the Initial Franchisee Fee shall be twenty five (25%) of our then current Initial Franchise Fee charged to franchisees.

Nothing herein obligates us to grant you an additional franchise and you do not obtain rights pursuant to this Agreement to purchase or operate more than one franchise location.

    B.    <u>Royalty Fee</u>. In addition to the Initial Franchise Fee, during the full term of this Agreement and in consideration of the rights granted to you, you must pay to us or our designee a monthly Royalty Fee in an amount equal to 5% of Gross Sales.

C.     <u>Advertising Fee</u>. If you have a Full Franchise Location, we can require you to pay to us or our designee an Advertising Fee of up to 2% of your Gross Sales upon 60 days written notice to you, as further described in Paragraph 8.B of this Agreement. If we establish the Advertising Fund your local advertising requirement will decrease in a corresponding percentage. For instance, if we require you to pay an Advertising Fee of 2%, your local advertising requirement will be decreased from 5% to 3%.

D.     <u>Added Services Fee</u>. You must pay us or our designee a monthly Added Service Fee of up to 5% of your Gross Sales, with a minimum payment of $250. We may increase the Added Services Fee on thirty (30) days written notice. You must begin paying the Added Services Fee ninety (90) days after you sign the Lease Agreement, regardless of whether or not your WATERS EDGE WINERY & BISTRO store is open for business. The Added Services Fee will be used to provide one or more of the following additional services we elect to provide you as more fully described in the Operations Manuals: limited accounting support and assistance, limited financial consulting guidance, intranet/extranet access/website hosting, internet email accounts, website development assistance for your Store which will be accessible through our main website, and email and Internet marketing and advertising services using information you provide to us and we approve.

E.     <u>Technology Fee</u>. You must pay us or our designee our then-current monthly Technology Fee. The monthly technology fee amount you pay may vary based on your wine club sales volume. You will be required to pay the then-current set up and installation costs for each POS system, along with the then-current charge for the SSL certificate.

F.     <u>Default Fee</u>. We have the right to assess a fee of up to $2,500 per violation of any term, obligation or requirement of the Operations Manuals or this Agreement. Our assessment of this fee shall not constitute a waiver by us of our right to seek damages and/or other relief against you arising from the violation, including our right to terminate this Agreement pursuant to Section 13.

G.     <u>Computations and Remittances</u>. You authorize us to poll your POS to compute all amounts due and owing at the end of each month's operation and remittance for the amounts must be made to us on or before the 15th day of the following month, accompanied by the reports required by subparagraph 9.J of this Agreement. You must certify the computation of the amounts in the manner and form we specify, and you must supply to us any supporting or supplementary materials as we reasonably require to verify the accuracy of remittances. You waive any and all existing and future claims and offsets against any amounts due under this Agreement, which amounts you must pay when due. We have the right to apply or cause to be applied against amounts due to us any amounts that we may hold from time to time on your behalf or that we owe to you. Further, if you are delinquent in the payment of any amounts owed to us, we have the right to require you to prepay estimated Royalties.

H.     <u>Electronic Transfer</u>. We have the right to require all Royalty Fees, Advertising Fees, Added Services Fees, Technology Fees, amounts due for purchases from us and other amounts due to us to be paid through an Electronic Depository Transfer Account. At our request, you must open and maintain an Electronic Depository Transfer Account, and provide us with continuous access to such account for the purpose of receiving any payments due to us. Every month, you will deposit to the account sufficient sums to cover amounts owed to us prior to the date such amounts are due. You must sign any documents we or your bank requires to establish and implement the Electronic Depository Transfer Account. Once established, you must not close the Electronic Depository Transfer Account without our written consent.

      I.      <u>Interest Charges; Late Fees</u>.  Any and all amounts that you owe to us will bear interest at the rate of 18% per annum or the maximum contract rate of interest permitted by governing law, whichever is less, from and after the date of accrual.  In addition to interest charges on late Royalties and Advertising Fee payments, you must pay to us a service charge of $50 for each delinquent report or payment that you owe to us under this Agreement.  A payment is delinquent for any of the following reasons: (i) we (or our designee) do not receive the payment on or before the date due; or (ii) there are insufficient funds in your bank account to collect the payment by a transfer of funds on or after the date due.  The service charge is not interest or a penalty, it is only to compensate us for increased administrative and management costs due to late payment.  We also may levy fines against you for your failure to comply with your obligations under this Agreement, as further explained in the Operations Manuals.  Any interest, service charge or fine levied against you will be deducted from your Electronic Depository Transfer Account ten (10) days after you receive notice from us.

      J.      <u>Financial Planning and Management</u>.  You must record daily all sales using our designated software.  You must keep books and records and submit reports as we periodically require, including but not limited to a monthly profit plan, monthly balance sheet and monthly statement of profit and loss, records of prices and special sales, check registers, purchase records, invoices, sales summaries and inventories, sales tax records and returns, payroll records, cash disbursement journals and general ledger, all of which accurately reflect the operations and condition of your Store operations.  You must provide us or our designee passwords and access to your online accounting records and other accounting programs. You acknowledge and agree that we and our designee will have full and complete access to information and data entered and produced by the accounting programs without need to obtain prior notice or approval from you; however, you may restrict our ability to change accounting information and limit us to "view only" in the software setup.  You must compile, keep and submit to us, the books, records and reports to us as we periodically may prescribe.  The records that you are required to keep for your Store must include detailed daily sales, cost of sales, and other relevant records or information maintained in an electronic media format and methodology we approve.  You also must preserve and retain the books, records and reports for not less than 36 months.  You must allow us electronic and manual access to any and all records relating to your Store.

      K.      <u>Reports and Audit</u>.  Within 5 days after the end of each month, you must submit to us a report with respect to the preceding calendar month in the form and content as we periodically prescribe.  The report must include, but not be limited to, the following information for the preceding month:  (i) amount of Gross Sales, amount of sales and excise tax and the computation of the Royalties; and (ii) quantities of products purchased and the sources from which each were obtained.  Upon our request and within 30 days after notice, you must submit copies of your most recent sales tax return, monthly sales summary and monthly balance sheet and statement of profit and loss, including a summary of your costs for utilities, labor, rent and other material cost items.  Also, if requested by us to verify your Gross Sales, you must submit, within 30 days of request, all such books and records as we may require under our audit policies published from time to time.  You also must, at your expense, submit to us within 60 days after the end of each fiscal year a detailed balance sheet, profit and loss statement and statement of cash flows for such fiscal year, prepared on an accrual basis including all adjustments necessary for fair presentation of the financial statements.  We may require that the annual financial statements be reviewed by a certified public accountant.  You must certify all reports to be true and correct.  You acknowledge and agree that we have the right to impose these requirements on you regardless of whether we impose the same requirement on other franchisees.

      We or our authorized representative have the right at all times during the business day to enter the premises where your books and records relative to the Store are kept and to evaluate,